**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

RBG MANAGEMENT CORP.,

                          Plaintiff,

        v.

VILLAGE SUPER MARKET, INC.,

                          Defendant.

Case No. 1:22-cv-7996 _____

**COMPLAINT**

**JURY TRIAL DEMANDED**

Plaintiff RBG Management Corp., the operator of the supermarket chain of grocery stores known as "Morton Williams," by its undersigned attorneys, for its Complaint against Village Super Market, Inc. ("Village"), herein alleges as follows:

### OVERVIEW OF VILLAGE'S WRONGFUL CONDUCT

1.      This case concerns Village's egregious and tortious misuse of its economic leverage over a grocery supplier, Wakefern Food Corporation ("Wakefern"), which is a membership food cooperative made up of grocery store chains including Village.  Village wrongfully induced Wakefern to cut off its supply of private-label products to Village's competitor, the Morton Williams grocery store chain, midway through Wakefern's supply agreement with Morton Williams—thereby destroying a 14-year mutually beneficial business and contractual relationship.

2.      As a Wakefern member, Village knew Morton Williams had an unexpired supply agreement with Wakefern and that the private-label business under that supply arrangement was

1

growing and thriving.  But this did not deter Village from intentionally interfering with and causing Wakefern to breach its supply agreement with Morton Williams.

3.      Village did so to give its own new Gourmet Garage and Fairway Market grocery stores in Manhattan an unfair competitive advantage over Morton Williams in selling the same private-label products (collectively, the "Wakefern Private-Label Products" or "Private-Label Products") that Morton Williams had popularized in Manhattan for over a decade.  Indeed, Village acted with the specific intent to disrupt Morton Williams' success under its supply arrangement with Wakefern to give Village an unfair competitive advantage.

4.      In particular, Village was acutely aware that its newly acquired Fairway stores— which previously had carried their own unique private label products—could no longer do so for economic reasons, and that these private label products would have to be replaced with the same Private-Label Products that Wakefern sold to Morton Williams.

5.      Using its economic power and its position on Wakefern's Board of Directors, in or about January 2022, Village persuaded Wakefern to cut off its supply of its Private-Label Products to Morton Williams, so that Morton Williams could not compete with Village in selling those products going forward.

6.      In order to effectuate its scheme to interfere with the successful supply arrangement between Morton Williams and Wakefern, Village caused Wakefern to inform Morton Williams at a February 2022 business meeting that, in 90 days, it would be cutting off Morton Williams' supply of Private-Label Products, even though the Supply Agreement was supposed to run for over two more years.

7.      When Morton Williams asked why Wakefern was suddenly taking this destructive measure, Wakefern explained that it had been compelled to do so by Village:  Wakefern's second

largest member and a major financial contributor, whose personnel occupy a number of powerful positions at Wakefern, including a seat on its Board of Directors.

8.     Despite a months-long effort by Morton Williams to try to persuade Wakefern to honor its contractual obligations, the tortious interference by Village has prevailed and has severely damaged Morton Williams' business.

9.     Among other things, Morton Williams has been forced to scramble to secure a new, replacement primary wholesaler to supply it with private-label and other products, which will charge Morton Williams substantially higher prices.  As a consequence, Morton William must now start investing in and promoting the new private-label products from scratch.  Morton Williams will lose its own substantial investments in promoting Wakefern products, as well as the valuable benefits of Wakefern itself having promoted those products, which Morton Williams would have continued receiving if Village had not induced Wakefern to breach the supply agreement.

10.     The damages Morton Williams has suffered, and will continue to suffer, from Village's tortious interference and unfair competition are significant.  As a result of this conduct by Village, Morton Williams will face substantially higher costs and lower business volume and profits, because many customers may follow the Wakefern Private-Label Products by switching to Village's Fairway stores.

11.     Village not only has caused severe injury and damages to Morton Williams, it also has unjustly enriched itself with the benefits of Morton Williams' costly and extensive promotional and marketing efforts promoting Wakefern Private-Label Products for over 14 years.  And Village will continue to be unjustly enriched as more customers seeking those products switch to shopping at Village.

12.     As a consequence of Village's tortious actions, profits from its Fairway and Gourmet Garage stores will increase as customers switch to shopping there instead of Morton Williams in order to obtain popular Wakefern Private-Label Products.

## THE PARTIES

13.     Plaintiff RBG Management Corp. is a New York corporation with its principal place of business in New York City.  RBG does business under the name "Morton Williams Supermarkets" and is thus referred to herein as "Morton Williams."

14.     Morton Williams is a fine grocery business well known to New Yorkers.  Over its seventy years of operation in New York City, Morton Williams has built a favorable and valuable reputation for selling high-quality grocery products, and for being at the forefront of the latest trends and developments in the grocery industry.

15.     Its quality and reputation, in turn, have helped Morton Williams grow a considerable customer base in one of the most challenging and competitive markets in the country: Manhattan, where 14 of its 16 grocery stores are located.  A key to Morton Williams' success since 2008 has been its promotion of high-quality private-label products as a core part of its business strategy.

16.     Defendant Village Super Market, Inc. is a New Jersey corporation with its principal place of business in Springfield, New Jersey.

17.     Village is a NASDAQ-traded corporation that operates a supermarket chain, consisting of numerous ShopRite grocery stores, located in New Jersey, Pennsylvania, and Maryland.  In addition, Village has operated four Gourmet Garage specialty markets in Manhattan since 2019, and has operated five Fairway Markets in Manhattan since 2020.

## JURISDICTION AND VENUE

18.     This Court has diversity jurisdiction over the subject matter of this action under 28 U.S.C. § 1332, and this is a civil action between citizens of different states, in which the amount in controversy exceeds the sum of $75,000 exclusive of interest and costs.

19.     This Court has *in personam* jurisdiction over Village because the causes of action alleged herein arise from: (i) Village's transaction of business within the State of New York; (ii) Village's commitment of tortious acts within the State of New York; (iii) Village's tortious acts causing injury to Morton Williams within the State of New York; and (iv) Village's use and possession of real property situated within the State of New York.

20.     Venue lies in this District under 28 U.S.C. § 1391 because a substantial part of the events or omissions giving rise to Morton Williams' claims occurred in New York.

## FACTS RELEVANT TO MORTON WILLIAMS' CLAIMS
### The Importance of Private-Label Products

21.     Unlike brand-name goods, which are promoted by their third-party manufacturers and associated by consumers with those manufacturers, private-label products are marketed to consumers as a grocery chain's "own" goods.  Typically, the same private label covers a broad line of grocery goods of different types—ranging, for example, from bread products to frozen foods to fresh produce.

22.     During the mid-to-late 2000s, an increasing number of customers began showing a willingness to pay more to buy premium-quality grocery products, rather than simply seeking low prices.  Initially, the profits from this shift in consumer taste flowed mainly to manufacturers of premium brand-name products.

23.     While grocery stores also benefited from those increased sales, a large "cut" went to the brand-name manufacturers, eating into brand-name products' net profitability for grocery

chains.  In response, grocery chains began partnering with third-party food suppliers to adopt their own high-quality private-label product lines, with the goal of winning over some of this premium customer base by selling similar products at a lower price point under their "own" brand.

24.     Traditional grocery chains doing business in Manhattan also faced a unique challenge with the dramatic expansion of Trader Joe's and Whole Foods, whose primary business model is the sale of private-label products.  As a result, supermarket operators in Manhattan and other markets, including Morton Williams, needed to increase private-label offerings to thousands of products in order to stay competitive with these national retailers.

25.     While grocery chains thus have come to need private-label products, most chains, including Morton Williams, do not operate on a large enough scale to manufacture in-house the enormous variety of goods needed for a private label.  As a result, smaller grocery chains typically must order their private-label products from a third-party supplier, with which they enter into a comprehensive supply contract covering all their private-label needs.

26.     The smaller grocery chains themselves typically help promote and develop a customer base for their private-label products, which requires substantial time and investment of funds, floor space, and advertising space, among other things.  In exchange, the grocery chains pay a smaller sum for high-quality products than in the brand-name context and retain a larger portion of any profits from their sale.

27.     The grocery chains also develop a valuable reputational asset from having a well-regarded private-label product line associated with their stores. Having robust private-label product lines thus has become increasingly necessary for success in the competitive grocery business, especially in demanding markets like the Manhattan area.

### Morton Williams Builds Wakefern's Manhattan Private-Label Market

28.     The origins of Morton Williams' private-label business go back to the mid-2000s, when customers in Manhattan and elsewhere began showing more interest in paying a premium to buy high-quality grocery goods.  Morton Williams was one of the early grocery chains to seize the opportunity presented by the shift among consumers toward purchasing higher-quality grocery products, by introducing private-label lines to compete for that valuable business.  To achieve this objective, Morton Williams entered into a supply agreement with Wakefern in 2008, under which Wakefern would then supply it with Wakefern Private-Label Products under ShopRite labels.

29.     Wakefern is a retailer-owned cooperative that supplies Wakefern Private-Label Products to grocery stores.  By the mid-2000s, it had become an important business priority for Wakefern to penetrate the hypercompetitive but influential and trendsetting Manhattan market with its Private-Label Products.

30.     Wakefern had not been successful in marketing its Private-Label Products in Manhattan, as well as many other competitive markets, because the prevailing view at that time was that Wakefern Private-Label Products were relatively mundane and unremarkable in quality. That perception started to change in 2008, as a result of the contractual arrangement under which Wakefern began supplying its Private-Label Products and other products to Morton Williams.

31.     Before partnering with Morton Williams, the ShopRite brand of Wakefern Private-Label Products had not had much success breaking into the high-quality grocery market in Manhattan, despite significant efforts by Wakefern, and was not regarded as a premium option. For example, in a February 2011 Gothamist article titled "Would You Be Cool With ShopRite Instead of Walmart?" one journalist wryly observed that ShopRite was "no artisanal, locally-sourced organic farmers' market selling fair-trade goji berries."

32.     By 2008, Morton Williams already had an established reputation as an upscale grocery store chain principally located in Manhattan, whose stores were well-known and well-regarded among consumers there.  Morton Williams was thus in the perfect position to popularize and promote the Wakefern Private-Label Products, which, at that time, had struggled to find success in many markets, including Manhattan.

33.     Morton Williams was able to overcome the reputational obstacles faced by Wakefern's ShopRite brand of products through its own detailed knowledge of, and excellent reputation in, the high-end Manhattan market, as well as its extensive efforts to promote the Wakefern Private-Label Products.

34.     Between 2008 to 2018, through its promotional and marketing efforts, Morton Williams was able to successfully persuade a skeptical and demanding Manhattanite customer base that Wakefern's Private-Label Products were in fact high-quality goods that could be purchased at a lower price point than brand-name goods of similar quality.  To accomplish this task, Morton Williams invested enormous time, money, floor space, and advertising space in promoting Wakefern Private-Label Products.

35.     Morton Williams helped Wakefern expand its Private-Label Products business.  For example, based on valuable competitive information that Morton Williams provided about consumer produce demand at its Manhattan stores, Wakefern's produce department made adjustments to ensure it was supplying enough of the types of produce these trendsetting consumers were interested in.

36.     Through these and many other marketing and promotional activities, Morton Williams persuaded demanding Manhattanites, seeking cutting-edge quality, to embrace Wakefern Private-Label Products.  Morton Williams successfully created a marketplace for Wakefern's

private-label brands that were most important at that time, such as "ShopRite Kitchen" and "ShopRite Trading Company."

37.   Morton Williams' investments in promoting Wakefern private labels have increased over time.  In or around 2018 to early 2019, because of the importance of the private-label business, Wakefern began to upgrade its private label business in consultation with an elite brand designer, adding new upscale private-label brands such as "Bowl & Basket," "Paperbird" and "Wholesome Pantry."

38.   In connection with this private-label product upgrade, Wakefern had a meeting solely and specifically with Morton Williams in 2019, at which Wakefern described its plans for promoting these new upscale private-label brands and solicited marketing advice from Morton Williams.  The parties strategized together about how Morton Williams could help promote those products in the coming years, as Wakefern sold Morton Williams those products under their supply arrangement.

39.   Around the same time, at Wakefern's request, Wakefern and Morton Williams entered into a long-term supply agreement on May 6, 2019 (the "2019 Supply Agreement"), which, among other things, enabled Morton Williams to purchase Private-Label Products sold under the new upscale private-label brands as well as the traditional Wakefern private-label brands.

40.   Following the adoption of the 2019 Supply Agreement, Morton Williams redoubled its hard work and costly efforts to promote Wakefern private labels.  For example, Wakefern sent Morton Williams "glamor shots" of its new Bowl & Basket and Paperbird lines, aimed at continuing to improve Wakefern Private-Label Products' reputation for quality, which Morton Williams used to promote those products in its stores and advertisements—giving up valuable floor space and advertising space to help increase the value and reputation of these private labels.

41.     Those promotional and marketing efforts have paid off, with Morton Williams selling Wakefern's upscale and traditional Private-Label Products profitably in increasing quantities at its stores.  Morton Williams' annual sales of Wakefern Private-Label Products have increased by millions of dollars since the signing of the July 2019 Supply Agreement, notwithstanding the fact that the COVID-19 pandemic caused many Manhattanites temporarily to relocate away from the island, causing temporary sales reductions for Morton Williams and other grocery businesses.

42.     Market commentators, in recognizing Morton Williams' status as a premier New York City grocery business, have noted in recent years how central its Wakefern private-label product lines have been to its success.  For example, one commentator—which rated Morton Williams at the top of its list of the "5 Best Supermarkets in New York"—summarized Morton Williams as "a long-standing, family-owned grocery chain in New York City that . . . *features ShopRite, its private-label brand that is supplied by Wakefern Food Corporation, ShopRite's parent company*."

43.     Furthermore, Morton Williams and Wakefern's business relationship was strongly secured by not only mutual economic benefit, but also personal ties.  Management at the two companies regularly participated in non-business events together, such as working on Toys-for-Tots activities, attending annual golf events, going out for dinners, and celebrating holidays.

### The Morton Williams-Wakefern Supply Agreements

44.     From 2008 to 2022, Morton Williams and Wakefern memorialized their mutually beneficial supply relationship under a series of supply contracts.  Given the parties' close ties and their mutual economic benefit from their supply relationship, the periodic renewals of their supply agreements occurred routinely and repeatedly without incident.  For example, their March 1, 2013

"Purchase and Sales Agreement" extended from March 2013 through February 2016, and then was renewed annually until the adoption of the 2019 Supply Agreement.

45.     The 2019 Supply Agreement was drafted by Wakefern.  Morton Williams made limited requests for changes in the language that resulted in only a few minor tweaks to provisions not at issue in this case.

46.     As was true of the prior supply contracts, one of the central purposes of the 2019 Supply Agreement was for Wakefern to supply Morton Williams with Private-Label Products.  In the 2019 Supply Agreement, Wakefern explicitly committed to pay Morton Williams "an annual Private Label fund" (App. 2, 8(b)) and warranted that the "private label goods purchased by [Morton Williams]" would meet various demanding specifications (§ 9(b)).

47.     The 2019 Supply Agreement, which was set to extend to May 6, 2024, also provided for automatic renewals for successive twelve-month periods thereafter unless either party gave advance written notice to the contrary.  Significantly, it was Wakefern that specifically sought this longer five-year term, instead of the annual renewals that had been occurring for the last several years—a tacit acknowledgment of the many benefits to Wakefern flowing from its private-label supply arrangement and business partnership with Morton Williams.

48.     Furthermore, the economic benefits from this Wakefern-Morton Williams contractual relationship had grown over time and were set to keep growing.  As one market commentator noted recently, "[p]rivate label products are continuing their forward momentum," with impressively high favorability ratings among consumers at all income levels:  "59.6% of high-income consumers have favorable opinions of private label products, compared to 55.2% of middle income and 52.5% of low-income shoppers."

49.     With Wakefern's Private-Labels Products having been popularized in Manhattan through the promotional efforts of Morton Williams, and associated in customers' minds with Morton Williams, both Wakefern and Morton Williams were well placed to keep profiting from this surge in consumer demand for high-end private-label grocery products in Manhattan.

50.     This long, productive contractual relationship between Morton Williams and Wakefern has now been willfully destroyed by Village, which, as described below, intentionally exercised its economic power over Wakefern to cause it to breach the 2019 Supply Agreement and cut off Wakefern's supply of its Private-Label Products to Morton Williams.

**Village Enters the Manhattan Grocery Store Market**

51.     Beginning in 2019 and continuing through 2020, Village acquired several Gourmet Garage grocery stores and Fairway Market grocery stores located in Manhattan in order to penetrate the Manhattan grocery store market.  Village kept the Gourmet Garage and Fairway Market store names as part of this effort to finally break through in Manhattan.

52.     While there was very little competition for customers between Morton Williams and Village before 2020, Village's purchases of these Gourmet Garage and Fairway stores resulted in direct competition with Morton Williams at a number of locations from Lower Manhattan to the Upper East and West Sides.

53.     For example, the Gourmet Garage of SOHO on Broome Street is a brief walk up West Broadway to Morton Williams' Bleecker Street location, which also is not far from the Gourmet Garage on Hudson and Bank Street.  The Fairway Market of Chelsea on 6th Avenue and 26th Street is close to Morton Williams' store on Park Avenue and 22nd Street.

54.     That same Morton Williams store is near to the Fairway Market of Kips Bay on 2nd Avenue and 30th Street, which, in turn, is even closer to the Morton Williams store on 2nd

Avenue and 23rd Street.  Farther north, the Fairway Market of 86th Street near 2nd Avenue is a short walk from the Morton Williams store on 1st Avenue and 81st Street.  And, on the other side of Central Park, customers have the option of Fairway on Broadway and 74th Street or Morton Williams on 11th Avenue and 60th Street.

### Village's Manhattan Grocery Stores Do Not Meet Its Financial Expectations

55.     Village's Manhattan grocery stores struggled after the acquisition, once the COVID-19 pandemic hit and many Manhattanites temporarily moved to other locations—especially Village's Fairway stores, which already had been failing before being acquired.

56.     In response to these financial challenges and the inability to achieve the economies of scale needed to continue with the Fairway label, Village decided to abandon Fairway's former unique private label, which had failed in Manhattan, and instead adopted the Wakefern private labels that Morton Williams successfully had popularized in Manhattan.

57.     But Village still had to contend with Morton Williams as the grocery chain in Manhattan that was most associated with these private-label brands.  As a Wakefern member, Village knew that Wakefern's supply arrangement with Morton Williams was thriving and sales were growing, and that Morton Williams was a strong and healthy competitor.

58.     Moreover, Morton Williams has a long history of successful growth in Manhattan, and, upon information and belief, Village expected that Morton Williams would continue expanding and opening new stores, thereby presenting additional competitive threats to Village's Fairway and Gourmet Garage stores.

59.     Significantly, unlike Morton Williams, Village is a member of the Wakefern cooperative—indeed, "the second largest member of Wakefern."   Village "owns 12.2% of

Wakefern's outstanding stock as of July 31, 2021," according to its 2021 Form 10-K.  Like Morton Williams, Village is supplied by Wakefern with Private-Label Products.

60.     As the second largest shareholder in Wakefern, Village has direct influence over Wakefern's operations through its shareholder voting power.  Village also has power over Wakefern through its presence on Wakefern's Board of Directors and various committees.  As Village explains in its Form 10-K:

> Executives of the Company [*i.e.*, Village] spend a significant amount of their time working on various Wakefern committees, which oversee and direct Wakefern purchasing, merchandising and other programs.  In addition, Nicholas Sumas, the Company's Co-President, is a member of the Wakefern Board of Directors.

61.     Village also has substantial financial leverage over Wakefern because Village is a major source of Wakefern's funding.  For example, for any products offered by Wakefern, Village must purchase a minimum of 85% of its requirements thereof from Wakefern—a constant stream of money flowing from Village to Wakefern, whose volume is enormous, given that Village's annual revenues total over $2 billion.  Furthermore, as of July 31, 2021, Village had made over $33 million in capital contributions to Wakefern.

62.     The problem that Village was facing was that Manhattan consumers had come to think of Morton Williams as the place to buy Wakefern Private-Label Products.  This was competition that Village did not want.

63.     To try to crush this competition from Morton Williams, Village decided to use its economic leverage over Wakefern to cause it to breach its Supply Agreement with Morton Williams and cease supplying it with the Wakefern Private-Label Products. As described below, this unfair competition and willful tortious interference by Village has deprived Morton Williams of the fruits of its contractual and business relationship with Wakefern, while Village has been

unjustly enriched with the benefits of Morton Williams' investment and promotional work in support of the brands comprising the Wakefern Private Label Products.

**Wakefern Breaches the 2019 Supply Agreement at Village's Behest**

64.     On February 21, 2022, Morton Williams' senior management attended a meeting with a senior Wakefern representative at the latter's invitation.   Wakefern had described the meeting in advance as merely a "Business Update," so Morton Williams did not expect anything other than a routine discussion.

65.     To be sure, Morton Williams had noticed some changes in Wakefern's behavior toward it, starting after Wakefern's member Village made its 2020 Fairway acquisitions in Manhattan.  For example, Wakefern stopped inviting Morton Williams to its annual LPGA golf event.  But Morton Williams did not believe such little snubs reflected any danger to its business and contractual relationship with Wakefern.

66.     Instead of a routine business update, the senior Wakefern representative abruptly announced at the meeting that Morton Williams had 90 days to stop buying Wakefern Private-Label Products and that, after that date, Wakefern would no longer accept Morton Williams' orders for those products.

67.     The senior Wakefern representative's announcement came as a complete shock to Morton Williams' management—not only because their private-label supply arrangement had benefited both sides for so long, but also because there was nothing in the 2019 Supply Agreement permitting Wakefern to unilaterally cut off its supply of Wakefern Private-Label Products at this time, more than two years before that Agreement expired.

68.     Upon being asked by Morton Williams' senior management what had suddenly prompted this destructive decision, Wakefern's representative explained that Wakefern had been

compelled to do so by Village.  The Wakefern representative told Morton Williams' senior management that Village had decided to stop using the former "Fairway" private label at its Fairway Market stores in Manhattan.

69.     The Wakefern representative then informed Morton Williams' senior management that Village had decided to have its Fairway stores market the same Wakefern Private-Label Products that already were being promoted and sold by Morton Williams, and that Village did not want Morton Williams to sell those products in competition with Village.

70.     Morton Williams' senior management was also informed by the Wakefern representative that, at Village's behest, a vote had been held by Wakefern's Board of Directors— of which Village's Co-President, Nicholas Sumas, was and is a member—and Wakefern's Board had voted, at the urging of Village, to stop Wakefern from selling its Private-Label Products to Morton Williams.

71.     Wakefern made this decision to breach the 2019 Supply Agreement and cut off its supply of Private-Label Products to Morton Williams because Village had major economic and operational leverage over Wakefern.  But for the exercise of this pressure by Village over the Wakefern Board, Wakefern would have continued to sell Wakefern Private-Label Products to Morton Williams, and it would have continued to extend the term of that Agreement in order to do so.

72.     Wakefern would have continued to sell its Private-Label Products to Morton Williams because their supply arrangement had been an economic success for both parties since 2008.  There was and would be no legitimate reason for Wakefern to cease selling Wakefern Private Label Products to Morton Williams in light of the success of the parties' arrangement.

73.     Indeed, Morton Williams' annual sales of Wakefern's Private-Label Products had *increased* by millions of dollars since the 2019 Supply Agreement took effect in May 2019, despite the fact that Morton Williams and other Manhattan grocery businesses were suffering from the temporary relocations of many of their customers away from Manhattan due to Covid-19.

74.     In response to Wakefern's unjustifiable decision to cease selling Wakefern Private Label Products to Morton Williams, Morton Williams made repeated efforts to try to change Wakefern's mind and urged it to honor the terms of the 2019 Supply Agreement.  Wakefern refused to do so.

75.     Because Wakefern's refusal to continue supplying Morton Williams with Wakefern's Private-Label Products was a material breach of the 2019 Supply Agreement, Morton Williams sent Wakefern a contractually-provided-for notice of its breach on July 5, 2022.  In that letter, Morton Williams informed Wakefern that because it would not honor the terms of the 2019 Supply Agreement, Morton Williams had no choice but to seek out a new supplier to replace Wakefern.

76.     Wakefern's refusal to supply Morton Williams with its Private-Label Products under the 2019 Supply Agreement—with more than two years remaining before its expiration—was a material breach of the plain terms of the Agreement.  Morton Williams has experienced severe injuries and damages as a result of Wakefern's breach, which, in turn, resulted from Village's tortious interference and unfair competition.

**<u>Injuries and Damages to Plaintiff</u>**

77.     Village's inducement of Wakefern to cut off its private-label supply to Morton Williams has injured Morton Williams and caused it to suffer severe and continuing damages in the form of, among other things:  (i) supplier replacement costs; (ii) heightened costs for private-

label products and other products; (iii) loss of sales and profits; (iv) loss of the value of past investments in promoting Wakefern private labels; and (v) the costs of promoting and popularizing new private labels.

78.    As a result of Wakefern's tortious conduct, which has damaged its contractual supply relationship with Morton Williams beyond repair, Morton Williams will have to pay significantly more now to order both private-label and other goods from another supplier than Wakefern had charged Morton Williams for similar products.

79.    Morton Williams also will be damaged by the need to spend time and money promoting new private labels among its customers.  Furthermore, Morton Williams will suffer additional significant damages in the form of lost customers who will leave it for Village in order to keep purchasing the Wakefern private-label brands that Morton Williams had been promoting to these customers for many years.

80.    Morton Williams will suffer further damages from the loss of value of the investments it has made over the last 14 years in promoting Wakefern Private-Label Products, including, among other things, the dedication of ample floor space and advertising space to those products.

81.    Additionally, Morton Williams was in the process of launching a new store, which would have sold Wakefern private-label and other products, when Village induced Wakefern to cut off Morton Williams' supply of private-label products midway through the Supply Agreement. This has resulted in significant disruptions to the new store's launch, causing damages to Morton Williams, in addition to future lost profits at this store due to heightened costs and reduced sales.

82.    The compensatory damages that Morton Williams has suffered and will continue to suffer will total in excess of ten million dollars.  These damages include both losses already

suffered by Morton Williams and future damages, which span through the Supply Agreement's scheduled May 6, 2024 auto-renewal date and beyond that date, when the Agreement would have been renewed if not for Village's tortious conduct.

83.     In addition to the losses suffered by Morton Williams, Village now will be able to expropriate Morton Williams customers who had become loyal to the Wakefern labels as a result of Morton Williams' investments and labor, thereby resulting in Village's unjust enrichment. Village will also be able to charge higher prices for Wakefern private-label products in its Manhattan Fairway stores because it will no longer face the competition of Morton Williams in selling those products.

84.     Upon information and belief, Village will reap unjust enrichment benefits as a result of its unlawful behavior in excess of ten million dollars.

85.     The harms from Village's misconduct will extend beyond Morton Williams to the public who otherwise would have purchased Wakefern private-label products at Morton Williams. It is expected that Village will charge higher prices for these products without the competition of Morton Williams for the ShopRite private label brands, and will also make these brands available in fewer locations in Manhattan, since Village only currently has five Fairway stores in Manhattan, in comparison to the 14 Manhattan stores of Morton Williams.

### FIRST CLAIM FOR RELIEF

### Tortious Interference with a Contract
### (Compensatory and Punitive Damages)

86.     Morton Williams incorporates and realleges, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

87.     The 2019 Supply Agreement was a valid and binding contract for consideration between Morton Williams and Wakefern, which required that Wakefern supply certain goods to Morton Williams, including Wakefern's Private-Label Products.

88.     Village knew of the foregoing contract and the ongoing Wakefern Private-Label supply relationship between Morton Williams and Wakefern, as well as the fact that that supply relationship was growing and thriving, by virtue of: (i) Village's membership in Wakefern; (ii) the presence of Village's officers in various positions at Wakefern, including on its Board of Directors; (iii) the fact that Village owned (and continues to own) Fairway and Gourmet Garage stores in Manhattan competing with Morton Williams; and (iv) the fact that the Wakefern-Morton Williams private-label supply relationship was generally known throughout the industry.

89.     Wakefern was induced by Village to breach the 2019 Supply Agreement by refusing to continue supplying its Private-Label Products to Morton Williams before the expiration of that Agreement's term.

90.     Village intentionally, improperly, and culpably procured the foregoing breach of contract by inducing Wakefern to cut off its private-label supply to Morton Williams and by exercising economic leverage over Wakefern, which is financially and operationally dependent on Village, to the benefit of its Gourmet Garage and Fairway stores.

91.     Village induced the foregoing breach of contract not to promote the independent business interests of Wakefern, but to promote Village's own distinct interests, at the expense of what had been a mutually beneficial contract between Wakefern and Morton Williams.

92.     Village's inducement of Wakefern's breach of contract violates the minimum level of ethical behavior expected in the marketplace.

93.     As a result of Village's tortious interference with its contractual relationship with Wakefern, Morton Williams has suffered and will suffer damages expected to total in excess of ten million dollars, in an amount to be determined at trial.

94.     Punitive damages should also be awarded against Village on this cause of action because Village's abuse of its financial and operational leverage over Wakefern to cause it to cut off its Private-Label Products supply to Morton Williams midway through the initial term of the 2019 Supply Agreement—thereby destroying a 14-year business relationship that was of mutual benefit to Morton Williams and Wakefern—evinces a willful and wanton disregard for Morton Williams' rights that is sufficiently egregious to warrant punitive damages.

## SECOND CLAIM FOR RELIEF

### Tortious Interference with Economic Relations and Prospective Economic Relations (Compensatory and Punitive Damages)

95.     Morton Williams incorporates and realleges, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

96.     An economic relationship existed between Morton Williams and Wakefern, under which Wakefern supplied Morton Williams with its private-label products, among other goods.

97.     In addition, a prospective economic relationship existed between Morton Williams and Wakefern.  Their existing economic relationship was set to renew in May 2024 and annually thereafter, and it would have so renewed but for Village's wrongful interference.

98.     Village knew of the foregoing economic relationship and prospective relationship between Morton Williams and Wakefern with respect to supplying private-label goods, as well as the fact that this economic relationship was growing and thriving, by virtue of:  (i) Village's membership in Wakefern; (ii) the presence of Village's officers in various positions at Wakefern, including on its Board of Directors; (iii) the fact that Village owned (and continues to own)

Fairway stores in Manhattan competing with Morton Williams; and (iv) the fact that the Wakefern-Morton Williams private-label supply relationship was generally known throughout the industry.

99.     By wrongful means, Village intentionally, improperly, and culpably interfered with the foregoing economic relationship and prospective relationship of Morton Williams by inducing Wakefern to cut off its Private-Label Products supply to Morton Williams, and by exercising economic leverage over Wakefern, which is financially and operationally dependent on Village, to the benefit of its Gourmet Garage and Fairway stores.

100.    Village interfered with the economic relationship and prospective economic relationship of Morton Williams and Wakefern not to promote the independent business interests of Wakefern, but to promote Village's own distinct interests, at the expense of what had been a mutually beneficial supply arrangement between Wakefern and Morton Williams.

101.    Village's interference with the economic relationship and prospective economic relationship between Morton Williams and Wakefern violates the minimum level of ethical behavior expected in the marketplace.

102.    As a result of Village's tortious interference with Morton Williams' economic relations and prospective economic relations with Wakefern, Morton Williams has suffered and will suffer damages expected to total in excess of ten million dollars, in an amount to be determined at trial.

103.    Punitive damages also should be awarded against Village on this cause of action because Village's abuse of its financial and operational leverage over Wakefern to cause it to abruptly cut off its Private-Label Products supply to Morton Williams midway through the 2019 Supply Agreement—thereby destroying a 14-year business relationship that was of mutual benefit

to Morton Williams and Wakefern—evinces a willful and wanton disregard for Morton Williams' rights that is sufficiently egregious to warrant punitive damages.

### THIRD CLAIM FOR RELIEF

#### Unfair Competition
#### (Compensatory and Punitive Damages)

104.     Morton Williams incorporates and realleges, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

105.     Village unfairly and in bad faith induced Wakefern to cut off its supply of Wakefern Private-Label Products to Morton Williams, a competitor of Village, midway through the 2019 Supply Agreement, while initiating sales of such products at Village's own competing stores.

106.     By the foregoing unfair and bad-faith conduct, Village has misappropriated Morton Williams' skills, expenditures, labors, commercial advantages, benefits, and goodwill, by engaging in unlawful conduct to make it impossible for Morton Williams to continue to sell Wakefern Private-Label Products, so that those sales instead could be made by Village without Morton Williams' competition in selling the same products.

107.     Furthermore, Village has improperly transferred to itself the benefit of Morton Williams' prior investments in promoting Wakefern's Private-Label Products and the associated goodwill and reputation that Morton Williams had developed.

108.     The foregoing private-label supply relationship between Morton Williams and Wakefern was one of mutual benefit.  Wakefern's termination of that supply relationship was caused by Village's wrongful inducement and not by Wakefern's own competitive interests independent of that inducement.

109.     As a result of the foregoing unfair and bad faith conduct by Village, Morton Williams has suffered, and will continue to suffer, damages expected to total in excess of ten million dollars, in an amount to be determined at trial.

110.     Punitive damages also should be awarded against Village on this cause of action because Village's abuse of its financial and operational leverage over Wakefern to cause it to abruptly cut off its Private-Label Products supply to Morton Williams midway through the 2019 Supply Agreement—thereby destroying a 14-year business relationship that was of mutual benefit to Morton Williams and Wakefern—evinces a willful and wanton disregard for Morton Williams' rights that is sufficiently egregious to warrant punitive damages.

## FOURTH CLAIM FOR RELIEF

### Unjust Enrichment
### (Restitution and Disgorgement)

111.     Morton Williams incorporates and realleges, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

112.     Village unjustly and inequitably induced Wakefern to cut off its supply of Wakefern Private-Label Products to Morton Williams midway through the 2019 Supply Agreement, while initiating sales of such products at its own competing stores.

113.     A relationship and close connection exist between Morton Williams and Village, and, in particular, between Morton Williams and Village's conduct at issue in this case, which concerns the 2019 Supply Agreement between Morton Williams and Wakefern.

114.     Village is the second largest member of Wakefern, with its own officers serving on Wakefern's Board of Directors and on committees at Wakefern, and intentionally has abused those connections to cause Wakefern to cut off its supply of Private-Label Products under the 2019 Supply Agreement.

115.    By the foregoing unjust and inequitable conduct, Village has caused and will continue causing benefits and enrichment to itself by, among other things, ensuring that its own Gourmet Garage and Fairway stores in Manhattan can sell Wakefern's Private-Label Products, while preventing Morton Williams from competing for such sales.

116.    As a result, Village will be unjustly enriched by reaping the benefit of selling Wakefern Private-Label Products that otherwise would have been sold by Morton Williams, and by charging higher prices for such sales than would have been possible if Morton Williams could sell Wakefern Private-Label Products in competition with Village's stores in Manhattan.

117.    In doing so, Village unjustly has transferred to itself the benefit of Morton Williams' prior investments in promoting Wakefern's Private-Label Products.

118.    The benefits and enrichment to Village from the foregoing misconduct will not and cannot be redressed fully by any other cause of action set forth in this Complaint.  For example, Village has facilitated charging its own customers higher prices for Wakefern's Private-Label Products by interfering with Morton Williams' ability to compete with Village for the sale of such Products.

119.    Accordingly, even if full compensatory damages were to be awarded for all of Morton Williams' losses, as sought under the other causes of action herein, Village nevertheless would remain unjustly enriched by the competitive benefits it has obtained through its wrongful conduct.

120.    It would be against equity and good conscience to permit Village to retain the foregoing unjust benefits and enrichment, for which Morton Williams seeks recovery, restitution, and disgorgement, with the amount of such unjust enrichment to be determined at trial.

## PRAYER FOR RELIEF

WHEREFORE, Morton Williams prays as follows:

A.     That it be adjudged that Village engaged in tortious interference with contractual relations by intentionally and improperly inducing Wakefern to breach the Supply Agreement, a valid and binding contract with Morton Williams, thereby causing injury and damages to Morton Williams;

B.     That it be adjudged that Village engaged in tortious interference with economic relations and prospective economic relations by intentionally and improperly interfering with the business relationship and prospective relationship between Morton Williams and Wakefern, including by causing future renewals of the 2019 Supply Agreement not to occur, thereby causing injury and damages to Morton Williams;

C.     That it be adjudged that Village engaged in unfair competition by, unfairly and in bad faith, inducing Wakefern to cut off its supply of Private-Label Products to Morton Williams, midway through the 2019 Supply Agreement, while selling such products at its own competing stores, thereby misappropriating Morton Williams' skills, expenditures, labors, commercial advantages, benefits, and goodwill.

D.     That it be adjudged that Village engaged in unjust enrichment by inducing Wakefern to cut off its supply of Private-Label Products to Morton Williams midway through the 2019 Supply Agreement, to Village's own unjust benefit and enrichment, which cannot be accounted for fully through compensatory damages to Morton Williams;

E.     That judgment be entered for Morton Williams against Village in the amount of (i) the damages sustained by Morton Williams and (ii) the unjust enrichment of Village, together with (iii) punitive damages, to be determined at trial; and

F.     That Morton Williams be accorded such other, further, or different relief as the case may require and that the Court may deem just and proper under the circumstances.

## JURY TRIAL DEMANDED

Morton Williams demands a trial by jury on all issues so triable under Rule 38 of the

Federal Rules of Civil Procedure.

Dated:     September 19, 2022               By:  s/Jeffrey L. Kessler
                                                Jeffrey L. Kessler
                                                Martin C. Geagan
                                                Mark E. Rizik Jr.
                                                **WINSTON & STRAWN LLP**
                                                200 Park Avenue
                                                New York, New York 10166
                                                Tel: (212) 294-6700
                                                Fax: (212) 294-4700
                                                jkessler@winston.com
                                                mgeagan@winston.com
                                                mrizik@winston.com

                                                *Counsel for Plaintiff RBG Management Corp.*